H. G. TYSON v. CITY OF SALISBURY.

(Filed 15 December, 1909.)

1. **Bond Issues—Legislature—"Aye" and "No" Vote—Constitutional Law—Clerk's Erroneous Endorsement—Title of Bill.**

An act to allow a city to issue bonds passed upon its various readings with the "aye" and "no" vote in accordance with the Constitution, is not rendered invalid after its passage in one branch of the Legislature by the erroneous endorsement of the Clerk of the other branch thereof, when it appears there was no substantial difference therein, the numbers of the bill corresponded in every respect, the title on the face of the bill was unchanged, no other bill of like import was introduced at that session, and that the one first introduced became the act as finally ratified. *Improvement Company v. Commissioners,* 146 N. C., 353, cited and approved.

2. **Bond Issues—Legislature—Various Issues—Different Purposes—Elections—Interpretation of Laws.**

An act authorizing a city to issue bonds in the amount of $300,000, the issue in the first year not to exceed $100,000, and in any subsequent year not to exceed $50,000. *Held,* (1) a grant of legislative power for the issuance by the city of $300,000 in bonds if so much were required for the purposes set forth in the act, and if it were found by the city that so much would not be required, then for the amount ascertained by the city and designated by the act and in accordance with its terms is constitutional and valid; (2) the intent of the Legislature was that one election be held for the various issues of bonds, and the fact that the issues were for various specified purposes does not affect the question, or change this ruling.

**3. Bond Issues—Elections—Notice—Legislative Acts—Substantial Compliance.**

Objection made in this case to the regularity or validity of an issue of bonds by a city, that the ordinance calling an election and the notice of the election are not specified, is untenable, it appearing that the time of the election was clearly stated in two newspapers publishing it, and that a sufficient opportunity to register and vote was given to all the qualified voters of the city, and that the requirements of the act were substantially, if not fully, complied with by the city authorities.

**4. Same—Maturity of Bonds.**

It is not necessary for the aldermen of a city to state the maturity of certain bonds to be voted upon in the call or notice of the election, when the act giving authority therefor refers that matter to their determination. In this case it appears that these matters were specifically stated in the call for and notice of election, and that the voters fully understood the proposition.

APPEAL from *Justice, J.,* May Term, 1909, of CATAWBA.

This action was brought for the purpose of testing the validity of certain bonds intended to be issued by the city of Salisbury for the purpose of funding the city's floating debt of $50,000, and for the further purpose of extending, enlarging, maintaining and operating the waterworks and sewerage system of the city, and of building, constructing, improving and maintaining its streets and sidewalks. The city of Salisbury caused an act to be passed by the General Assembly of North Carolina authorizing and empowering the board of aldermen of said city to issue bonds, not exceeding the sum of $300,000, in such denominations and forms and payable at such times and places as the board of aldermen may determine, provided that not more than $100,000 should be issued the first year and $50,000 in any subsequent year, until a whole $300,000 shall have been issued. The parties waived the trial by jury and agreed that the judge might find the facts and enter such judgment thereon as in law he might think was proper, subject to the right of appeal by either party. Under this agreement, the judge found the following facts and entered judgment in favor of the defendant, as will herein appear:

"1. That the plaintiff is a resident and taxpayer of the city of Salisbury, North Carolina.

"2. That the city of Salisbury is a municipal corporation, duly chartered and existing under and by virtue of the laws of North Carolina.

"3. That on 6 March, 1907, the General Assembly of North Carolina passed, enrolled, ratified and sent to the office of the Secretary of State an act entitled 'An act to allow the city of

Salisbury to issue bonds,' the same being published in the Private Laws of North Carolina, Session 1907, as chapter 335.

"4. On 26 February, 1907, there was introduced in the House of Representatives a bill to be entitled 'An act to allow the city of Salisbury to issue bonds.'

"5. This was the only bill which was introduced in the Legislature of 1907 providing for issuing bonds for the city of Salisbury.

"6. This bill was passed on three separate readings in the Senate and in the House, with the yeas and nays duly entered on the journals of both branches of the Legislature on the second and third readings, and it was duly enrolled and ratified on 6 March, 1907, all of which is set forth on the back of the original bill.

"7. That the journal entries on the bill are as set out in 'Exhibit B,' attached to the complaint herein.

"8. That the bill, as originally introduced, was not amended in the House or in the Senate, and the original bill, which took the number '1566' in the House and '1428' in the Senate, is in the same words and figures as the act which was finally passed, enrolled, ratified and sent to the office of the Secretary of State.

"9. That the board of aldermen of the city of Salisbury, after the passage of said act and on 22 July, 1907, duly and regularly enacted an ordinance providing for an election in the city of Salisbury to pass upon the question of issuing bonds under said act, as set forth in the ordinance.

"10. Pursuant to said ordinance and to the notice of election, an election was held in the city of Salisbury on 1 October, 1907, in compliance with all provisions of the law governing such elections, and a majority of the qualified voters of the city of Salisbury, at this election, voted a ballot, as provided in the ordinance and in the notice, with the word 'Issue' upon it.

"11. The board of aldermen thereupon determined, after fixing the time and place of payment, the amount and the purpose of the issue, to issue $100,000 of bonds, which bonds were issued and sold, being dated 1 April, 1908; $50,000 of the proceeds of the sale of said bonds being used to fund the city's floating debt and the remaining $50,000 for street improvements, as provided in the act.

"12. Thereafter, in due time, the board of aldermen of the city of Salisbury duly and regularly determined to lay bitulithic streets in the city of Salisbury, at a cost of $50,000, and to this end contracted with the Atlantic Bitulithic Company to do the work, agreeing to deliver to the said company, on or before 15

April, 1909, the proceeds from the sale of $50,000 of bonds, to be dated 1 April, 1909, or to deliver to said company said bonds, in accordance with the terms of the agreement, and the city of Salisbury has been and is now negotiating for the sale of said bonds to pay for the work of the Atlantic Bitulithic Company, which has now been completed.

"It is now, on motion of Burton Craige, counsel for the defendant, ordered and adjudged that the city of Salisbury is fully authorized by the act of the Legislature of 1907, referred to in the pleadings, and by the action taken thereupon by the board of aldermen of the city, to issue and sell the bonds in dispute, which, when duly and regularly issued by the board in the form prescribed and determined by the board of aldermen, will be legal and binding obligations upon the city of Salisbury. It is further ordered and adjudged that the motion herein for an injunction to prevent the issuance of the bonds be and the same is denied. It is further ordered that the plaintiff pay the costs, to be taxed by the clerk.                B. F. LONG, *Judge.*"

The plaintiff excepted to this judgment and appealed to the Supreme Court.

*Edwin C. Gregory* for plaintiff.
*Burton Craige* for defendant.

WALKER, J., after stating the case: We do not well see how there could be any doubt or uncertainty as to the authority of the city of Salisbury to issue the bonds, the validity of which is now questioned by the plaintiff. It sufficiently appears by the journals of the House of Representatives and the Senate that the bill, as it was first introduced, became the act as finally ratified, enrolled and transmitted to the office of the Secretary of State, all of which will appear from the numbers of the bill as it passed its several readings. There was nothing in the journal to show that it was ever amended in any way. The judge below has found as a fact, and it is not controverted, so far as it appears in the case and the briefs of counsel, that the only bill introduced in the Legislature pertaining to the issuing of bonds by the city of Salisbury during the session of 1907 was a bill to be entitled "An act to allow the city of Salisbury to issue bonds," it being the same title as found in the bill which was ratified and sent to the office of the Secretary of State from the House and Senate, in both of which branches of the Legislature the numbers of the bill correspond in every respect. It is evident that the clerk of the House entered in his journal the title of the bill

as it appeared on the back of the bill, and not the title as it appeared on the face of the bill. The two titles, as they appear in the case, are not substantially different, so as to disprove the identity of the bill when it passed its several readings in both houses. It is perfectly clear, from what appears in the facts as stated by his Honor, that the same bill which was introduced in the House and passed its several readings in that body, in perfect accordance with the requirements of the Constitution, is the one which also passed the Senate in the same way and was finally ratified, as prescribed by law, and transmitted to the Secretary of State. This is easily demonstrated by a bare statement of the facts, and no argument or discussion by us is required to establish the fact that the members of both houses understood distinctly and clearly the provisions of the bill as thus passed and ratified. It would be a perversion of law and justice if we should permit an erroneous statement of the true title of the bill, which is to be found on its back, to control the title as found on the face of the bill, and the provisions of the bill itself, so as to nullify what was done by the Legislature. In the case of *Improvement Co. v. Commissioners,* 146 N. C., 353, it being a case very much in point, the name, "Robeson County," in the title of the act, was changed to "Washington County" on one of its readings in the House. In that case we held: "It is apparent that the words 'Washington County' were intended for 'Robeson County' and is a mere clerical error. The number of the bill in its passage through the House, and the fact that the same bill, bearing House number 1483, passed the Senate under its proper title and was duly enrolled under said title and its proper House and Senate numbers, clearly prove that the words 'Washington County' were intended for 'Robeson County.'" We now affirm that decision, and it applies directly and conclusively to the facts of this case. When the bill was passed on its several readings in each of the houses, it should have been read, and we must presume that it was read, according to the title and provisions of the bill itself as they appear on its face, and not according to the title appearing on the back of the bill. Anyone having legislative experience must know that, under the facts and circumstances of this case, no member of either house, who are generally presumed to be men of a high order of intelligence, could have misunderstood what he was doing when he voted in favor of the passage of the bill, and this would seem to be the crucial test by which to determine whether the bill was passed intelligently and in accordance with the requirements of the Constitution and with the due observance of legislative procedure.

We have no doubt as to the second point made in the case. The bill authorized the city of Salisbury to issue bonds to an amount not exceeding $300,000, the issue in the first year not to exceed $100,000 and in any subsequent year not to exceed $50,000, until the entire amount of bonds, as designated in the bill or act of the Legislature and authorized by the latter, had been exhausted. It was a very wise provision, in the first place, to make, because it is manifest the city authorities did not, at the time the bill was introduced and the act was passed, know the exact amount that would be required for the purposes stated in the bill, and therefore it was so worded that they could issue the required amount within the limit prescribed by the bill or act. It would have been folly to have designated the particular amount, when it might have turned out by actual experience thereafter that such an amount was not required. The substantial effect of the act is to authorize the said authorities to issue $300,000 in bonds, if so much was required for the purposes set forth in the bill; and if it turned out that not so much would be required, then for such an amount as would be actually required for the uses and purposes of the city prescribed in the act.

Nor do we think it could be successfully contended that a special election was intended to be required for each issue of the bonds. It is manifest, from the very terms of the act, that the Legislature intended only one election, and conferred upon the city the authority to issue bonds for its uses and purposes, as designated in the act, but within the limit of $300,000. What good would be accomplished by having three or four special elections, when it was within the power of the Legislature to authorize the issue of the bonds by one election, to the extent of $300,000, if so much was required for the use of the city? If it had been intended that there should be as many elections as there were issues of bonds, the Legislature should certainly have expressed such an intention in clearer language than is to be found in this bill. It was for the very purpose of saving cost and expense to the city that the act was worded as it is. There are authorities sustaining our construction of the act, but it is so palpable that no other construction is permissible that we refrain from citing them. The mere fact that the bonds were to be issued for different purposes cannot affect or change the meaning of the act as we have declared it to be. There is no question made as to the regularity or validity of the election, except that the ordinance calling an election and the notice of the election are not specific. Without discussing this objection, we need only say that it is untenable, as it appears in both papers that the

time of the election is clearly stated, and a sufficient opportunity to register and vote was given to all of the qualified voters of the city, and that the requirements of the act were substantially if not fully complied with by the city authorities. The amount to be issued in each year was not necessary to be stated in the call for or the notice of the election, as that was to be determined according to the very terms of the act, by the board of aldermen, and it would have been well nigh impossible to have ascertained what amount would have been needed in each year until after the election had been held. As to the date of the maturity of the bonds, it was not necessary that this should be stated in the call or notice, because the act also refers that matter to the determination of the board of aldermen. But it would seem that all these matters were specifically stated in the call for and notice of election, and that every voter understood full well the proposition for which he was casting his vote.

We have examined this case very carefully, the record and briefs of counsel, and the authorities bearing upon the questions at issue, and have concluded that there is no error in the judgment of the court below, over which *Judge B. F. Long* presided.

Affirmed.